Okay, the next case before the court is Intellectual Ventures v. Symantec. It is case number 171814. It is an appeal from judgment of the District of Delaware with respect to two separate patents. There is a cross appeal, though it's a conditional cross appeal, I guess. Is that fair to say? That's correct, Your Honor. All right. And you wanted to reserve the possibility of a minute for rebuttal if, in fact, the cross appeal gets addressed in your friend's rebuttal. Is that right? Yes, thank you, Your Honor. Okay. So we'll try to work that out. As you know, we don't always let the lawyers control the clock in the long run. And Mr. Lahad, is that pronounced correctly? Yes, Your Honor. You are hoping for five minutes for rebuttal? Yes, Your Honor. Okay. You can begin. Good morning. I'm John Lahad for appellants. And may it please the court, the 533 patent is eligible for patenting because it discloses an improvement in real-time remote data mirroring. And it does so in a non-conventional way using, among other elements, a non-volatile data buffer in a DTU, data transfer unit, and the issuance of spoof packets. In the blue brief, I.V. says, Claim 25 claims a novel way of solving a problem. If there's a disruption to the primary network server or the substantially concurrent copy of the data in the data transfer unit would be available for use even before the copying to the remote system is complete. Yes. But we've held previously that similar requirements that a task happen contemporaneously doesn't make the claims patent eligible. And that's at Alice itself. And you can see updating shadow records in real-time in electric power. How does I.V. get around that clear precedent that's found that concurrent copies are directed to an abstract idea? Number one, the patent is not simply directed to a concurrent copy. The prior art methods of computer data backup suffer. No, but just answer my concurrent copy question. How do you get around that? That's Claim 25. If the patents were, assuming the patents are drawn to a concurrent copy, which I disagree with that, but if they are and that's an abstract idea, then the claims survive under Step 2 because they provide an inventive implementation detail of how to solve this problem. Okay, so if you go to Step 2, how does the data shadowing concurrent copy technique that were already in existence provide a sufficient inventive concept? Well, just to be clear, the patent involves data mirroring. Data shadowing is another term of art that is not covered by the patent. There is a distinction just to make that. But under Step 2, the claims provide a specific computer-based solution to this computer-based problem using implementation details. Unlike other cases, the claims in this case, Claim 25, provides detailed steps, provides the ordinary skilled artisan with how to accomplish improvement. I think what the trial court said was these are all interesting ideas that you're espousing, but they don't actually show up in the words of the claims. And when you look at the claims, the claims are very general and even your specification refers to off-the-shelf, well-known computer technology. The claims actually deliver the advantages discussed in the patent. The patent describes the shortcomings of the prior art, describes the shortcomings of data backup, of doing overnight backup, using tapes. What's the ordered combination in Step 25? You've got data on the primary service order. Is there a particular order of steps? I think there is. I think certain steps have to happen before other steps. For example, the data from the primary network server... Where does it say it? I'm sorry, Your Honor? Where in Claim 25 does it say that it has to happen in a particular order? Well, I think it's inherent in the way the data must be processed. You have to look at the claim. The first step is you've got the data in the primary network server. That's copied to the non-volatile data buffer in the DTU. And then the DTU transmits the data over the communications link to the remote server store. And then there is a spoof packet that is sent back to the DTU, excuse me, to the primary network server that essentially tells the primary network server that the save to the remote has been completed, even though it technically has not. It just allows the primary network server to proceed with business as usual. You didn't debate that any of those things weren't well known in the prior art, including the spoof packet, right? I think the implementation of the spoof packet here is novel and inventive and is not used in the prior art. Same thing with the DTU. Computers, as a matter of course, do not have the DTU. But where in the claim does it say that? The claim references the non-volatile data buffer of the DTU. It also references the spoof packet. Now, an alternative could be to use a volatile storage in the DTU and say, well, instead of using a non-volatile storage like a flash drive or a hard disk, we would use DRAM. I guess my problem is I'm searching as I might to find anything that it says that is an unusual way to use those things. I think the unusual way to use those things is computers do not have data transfer units, as a matter of course. Computers do not use spoof packets, as a matter of course. So if you believe that a DTU and a spoof packet are conventional, then the combination of these elements is inventive. And unlike other cases, the combination of these elements provides implementation detail. It provides a specific sequence of steps to achieve the desired result. We're not just saying back up the data and reclaiming the functional result. An ordinary skilled artisan could use the elements of this claim to achieve the advantages of the invention. Can you show me where in the spec there is a description that use of DTUs and spoof packets is not well-known or conventional in the prior art? If you look in the specification, I think it's at column 2 or actually it's column 6, that describes what the DTU is. The DTU is not an overlap of the primary server's store. What line? I'm sorry, this is appendix 133, excuse me, 135. It goes into significant detail as to what the DTU is. Wait, wait, wait, where? I mean, come on. Apologies. Column 6, if you focus, lines 46 through 57 or so, it discusses what the DTU is, what a data transfer unit. It's not merely just a section of the hard drive. It's not merely implemented in software. It's not a line of code. It is an instantiation of at least one microprocessor and a block of RAM, which is accessible by the microprocessor. It goes through and it explains what the DTU is and what the requirements of the DTU are. Then that claim is, that element, the DTU. Are you saying that, I mean, those all seem to be basic concepts. You've got a block of RAM that's accessible by the microprocessor. Right, so the DTU is composed of a microprocessor and DRAM, but again, DTUs aren't of available and don't just come in off-the-shelf computers. You don't go to the computer store and get a computer or a laptop that has an on-board DTU. Likewise, with the spoof packet. Are you saying this is an unusual or unknown or innovative arrangement of these components? Absolutely. Absolutely. As in countless other cases that have found that you can have an unusual and inventive combination of known elements. What evidence did you present to the trial court arguing that this is an unusual DTU and an unusual use of the DTU? We have declarations from our expert, Mr. Webster, who provided that. All right, and so where in his declaration does he say that DTUs were not well-known? Or arose by any other name? Your Honor, I apologize, I'm having trouble finding that exact slide. If I could have a minute when I sit down and come back up and find that. But to your comment, Your Honor, about arose by any other name, it's not arose by any other name. It is a specific component of this claimed method. There is no arose by any other name for a spoof packet or DTU. It's not a term of art like microprocessor or DRAM. It is a data transfer unit that has its own components. Now those components may be used in the same way for the same purpose. That's my question, arose by any other name. This is not the way you argued this in your briefing, am I correct? As far as the DTU? Yes. I think we do argue that the combination of these elements is inventive and passes muster under step two. Combination of what elements? Elements that make up the DTU or the DTU with other things, with the spoof packet? The former, the DTU with the spoof packet in the context of these specific series of steps. You're into your rebuttal, you want to save it? Yes. Actually, I take that back. I thought you would ask for five minutes, didn't you? Yes, Your Honor. Three. Okay, so you are into your rebuttal. Judge O'Malley, may I please have the court? This patent, the 533 patent, is a paradigmatic example of taking an abstract model, what the patent itself even says is an abstract model, and taking it from one computer context to another. Just to clarify the background of it, there were three prior art systems discussed in this patent. One was electronic vaulting in the mainframe context. The other two were tape data backups, and the third was also similarly end of day type of backups, the data shadowing is what it was called. What I want to focus on here is the first of those. Electronic vaulting by the patent's own admission does all of the things that are claimed to be inventive here, and that is a very up-to-date backup copy and a safe distance away. What's your response to his argument where he ended up, which is that the real inventiveness here is a particular form of DTU combined with a particular form of spoof packet, which was not well-known and conventional in the art. I think your honor is correct that that individual component was never called out as something different or novel, and that's the first time that I had heard this. I would point the court to their papers below, in the summary judgment papers, where they expressly acknowledge that every single one of those was convention. That's docket entry number 299, the very first page of it comes right out and says each of those are quote well-known. Have we got that in the appendix by any chance? It's not in the appendix because, I apologize your honor, this is the first time I'm hearing that it might be novel, so I just wanted to provide that and I'm happy to submit that to the court if that would be helpful, but the district court did reference that concession at page A46 of its opinion in saying I.B. doesn't point out that any of these are unconventional, and individual components could be conventional, but the way they're put together could be unconventional. Absolutely, and so when I answer that part of your honor's question, I just wanted to clarify the first part, the individual part, and then turning now to the combination. What you have to do is look at what the patent itself does, or in this case doesn't say is the innovation. It nowhere says that this particular combination somehow provides advantages over electronic vaulting. To the contrary, it says all we're doing with this patent is taking electronic vaulting and in the patent's words, porting it into a different technological context, doing it on the network, and we know from dozens of cases from Alice on that merely plopping it into another technological environment without describing anything unique or inventive about implementing it in that environment isn't enough, and I would point the court, for example, to another IV semantic case that came before this court where one of the patents was directed to data virus scanning or computer virus scanning, and the purported innovation there was to take it from one context, the local computer context, and instead perform it on the network, on a server, and this court found that that abstract concept, that abstract computer concept of virus scanning doesn't become inventive merely by saying do it out there on the network, and the same I would submit is true here. That combination is nowhere described as inventive. IV certainly hasn't pointed to any expert testimony in any of its briefs before this court, and I don't believe before the district court below, but certainly everything they relied on in this court was all the intrinsic record of the specification, and there is nothing in there, and in fact, it goes through in laborious detail in describing how each of these components are purely conventional. For example, mirroring data. It says every single operating system, network operating system has this capability. We're just going to use that, and again, coming back to the mainframe context, this was all done long ago, and if you look at their yellow brief at page 16, that's the one part where they try to distinguish that I could find clearly the electronic fault, and all they say is it's different because it's not in the mainframe context. It's in the network context. No description of how that might provide benefits, how these claims might provide benefits in the network context, nothing of that sort. So I would submit this falls directly in line with this court's cases where other real-time type data processing has been found ineligible, including a recent case, the two-way media case, which actually had one step of copying a real-time media stream to an intermediate server. It had that step in there, and ultimately, this court found that as a whole, they were directed to basic data processing things, and here, it's even more basic. It's copy, copy, copy, and send a signal, and that signal is the spoof packet. That, too, even before this court was acknowledged to be conventional. On page 28 of their blue brief, they say, or they acknowledge that it was wholly conventional, even to do it at certain times in the process, and to your Honor's question, I don't believe that there is any ordering required by Claim 25, and that's most clearly shown because Claim 26 does have certain ordering of when the spoof packet must be sent, and so on. So by implication, Claim 25 has no such ordering, and spoof packets are wholly conventional by I.V.'s admission, by I.V.'s expert admission at A5045, I believe, and so there's nothing unconventional about this, either individually or in combination. We didn't let your friend on the other side get to the 131, but I do want to ask you a question about it because, you know, one of the parts that I think is most compelling from the other side is the argument that they should have been allowed to at least amend their infringement contentions to assert a doctrine of equivalence claim, and, you know, amendments are supposed to be freely given, barring a conclusion that it really would be futile. So why is it that we shouldn't conclude that they should have been allowed to at least try to plead a DOE claim? And so, to your Honor's question, they actually were permitted to amend their infringement contentions. Over our objection, but they were... But then they were stricken. They were ultimately stricken because they were deficient, and here's what they did when they amended it. They failed to comply with most basic tenets of DOE law, which is you must deal with all of the limitations. Even if you say there's an equivalent to it, you have to do it, and they did the opposite here. What they said is there are certain limitations that are simply not material, and respectfully, you're not allowed to simply dismiss those. You need evidence on a claim-by-claim or an element-by-element basis of how this thing is equivalent, and they failed to do that, and so I think the district court was fully within its discretion to not allow them to amend again, and they actually didn't request to amend again. They stood on the notion that they don't have to address all of the elements. It's enough for them to say those are immaterial in the context of this case, and we submit that that is absolutely not true under DOE principles. What happens is under the local rules, they amended their contentions. They didn't amend the complaint. They amended their contentions, but that put the issue in play, DOE in play, if in fact they, on the face, asserted what you need to assert for a DOE claim, correct? We didn't contest that at that point. Once it was allowed to be amended in the contentions, the assumption by everybody was it's now part of the case, as long as they sufficiently included it, which the district court correctly found that they didn't, and just one other thing I would want to point out on this issue. I'm not sure the court even needs to reach that issue because in the stipulation as to the 131 patent, they stipulated that under the district court's construction, so assuming the court agrees with the 131 construction, under the district court's construction, there is no infringement literally or under the doctrine of equivalence. Now, my friend on the other side says, well, in the stipulation, we also said we intended to appeal the striking of the DOE contentions, and that's true, but what that means is they can appeal that insofar as the construction is disrupted. The stipulation by its plain term says if the construction stands, literal and DOE infringement are both out. Can I ask you something? Certainly. What exactly is a non-final judgment? I've never heard of such a thing. I've heard of partial final judgments under 54B, or I've heard of sending up a non-final conclusion for review under 1292, but how is there such a thing as a non-final judgment? To be honest, Your Honor, I'm not sure. Other than to say it's akin to an order, it's akin to an opinion along the way, if something is truly non-final, and I think you look at it functionally. Either it's final or it's not. If you label it as something or the other, I'm not sure that that. So should we just construe it as an order accepting the stipulation for purposes of entering a judgment later? I guess that's one way to construe it. Because if it really was a judgment and didn't fall under any of those other categories, then presumably the time to appeal should have started then, even though you guys called it non-final. I think that would be correct. So the court may ultimately conclude that there's not even jurisdiction over that. We obviously didn't press that issue. So we have a violation of the stipulation? Right. So unless the court has additional questions, I would just note, as the court did at the beginning, that we do raise a conditional cost appeal issue. The court doesn't need to address it if it otherwise affirms, and we think it should. But if it does choose to look at it, we think the Berkheimer case, the recent decision from this court, is directly on point in saying what is an indefinite term. It actually mentioned the word substantial in that case, although it also focused on the word minimal, but it said substantial as well. Those are terms of degree. But not every term of degree is indefinite, depending on the circumstances. Absolutely. So you need to look to the next step of that analysis in that case, which was is there enough in the spec to say, quote, how much. And I think there's really no contention here that there is any sort of how much as to substantial concurrence in this case. In other words, how much delay between two steps is too much. But if the court's construction was correct and we're talking about a processing delay, then that inherently has limitations on it. It's not like a circumstance where it's completely open-ended. It does have some limitations inherently, but Ivy's expert, Mr. Webster, said that that processing delay could last a minute, an hour, a year. He volunteered that in his deposition. And so in that context where there really is no theoretical maximum, we would submit that the patent was intending to do something other than that. And I think it's best looked at as a term of degree, but even looked at as a term of causation as they pressed, we would submit that it would still be indefinite. And with that, unless the court has questions, I'll reserve potentially one minute. Thank you. First of all, let me correct my misstatement earlier. There was no actual declaration in support of the conventional components aspect. Mr. Webster submitted declarations in support of the infringement case and in support of claim construction, particularly the indefinite decision. So there's no evidence in support of that point. There is no evidence by an expert. Again, it's just the intrinsic record that is the evidence. You don't need to bother with the non-final judgment thing. I'm a nerd when it comes to jurisdiction. You heard this argument that this is just electronic vaulting ported over to the network. That's not correct. In fact, the specification, this is at appendix 133 in the first full paragraph in column two, talks about electronic vaulting and says that the electronic vaulting hardware and software cannot be used in the client network topology. So this idea of just simply that the claim is simply porting over electronic vaulting to the client server network topology is just incorrect. As in core wireless, as in visual memory, as in FinGen and InFish, these claims provide an improvement over the prior art. They improve the way a computer works. In this case, they improve the way that computers back up data. This is not simply taking an idea, like backing up data, and saying do it on a computer. You cannot apply that framework here. There are certain things that are computer problems. This is a computer problem. The problem was that the prior art methods did not or recently created data to loss. If you backed up data at 2 a.m., you would lose the entire day's worth of data if there was an issue at 5 p.m. So this real-time data mirroring claim is an improvement in computer functionality. It's not just a claim. Real-time data backup was going on at the time. Not remotely, Your Honor. Not remotely. And the claim is not just do data backup substantially concurrent remotely. Then we get into step two. It is a specific way of doing remote data mirroring. Using conventional inputs. If your position is that the elements are conventional, then I would submit that the ordered combination of the elements is not conventional. This is a specific way to perform these tasks. This is different than other cases where it's just here is a result. The difference here is that the level of specificity provides sufficient implementation detail to achieve the improvement discussed in the specification. So this is in stark contrast to other cases like electric power, where it was just collect some data and present it. Like content extraction, which is organized data. And I think what's important is that in the step two analysis, there are other ways to do it. Meaning that step two, the claim is not unduly preemptive. As I said, you could use a volatile storage. If you wanted additional performance and speed at the expense of fault tolerance and reliability, you could forego with the spoof packet if you wanted less aggressive timing. Or you could perform. On the issue of. I'm sorry, you could what? Perform. I started it. Thank you. I do want to touch, if I can, on the summary judgment issue. It's a classic fact question that the court took away from the jury. And the question was whether or not these steps in the accused product happened substantially concurrently. The court held that the presence of this intervening step, which our experts said, and Symantec's documents say, happened simultaneously. The court held that a simultaneous step was not substantially concurrent. But didn't your expert also say that if you design in a delay, that by definition that was not substantially concurrent? That's not exactly what he said. That's not what he said. He said that there are other ways to design this. And there are other ways to achieve this in the accused product. But his opinion has always been that this product performs the steps substantially concurrently. This distinction between designed in delay and process in delay was something that the court came up with. Do you ask the court to say that the delay had to be causally related, right? Yes, we did argue that. And you said so it's either caused by a processing delay or it's caused by something else. And your expert agreed that if you design in a pause, that it's not caused by just a processing delay. Right. The distinction is whether the delay is occasioned by performance or execution of the program or processing data, and that's necessary to the operation of the program, or if the delay is arbitrary or based on some external trigger. If the delay is waiting until 2 o'clock in the morning or waiting until network traffic subsides, that moves away from substantially concurrent. If the delay is whether or not it's designed in, if it's, as we have in this case, a simultaneous action, if that delay is associated with the performance of the program or if it's required for the program, for example in this case it's remote write setup, it's part of the process, you can have a delay that is for recovery time, as our expert opines at appendix 926. There are such things as designed in delays that serve a function. Simply the fact that an accused product is designed a certain way does not preclude substantial concurrence. So that question was taken away from the jury in this case. What's your response with respect to the cross appeal to your expert's statement that a processing delay could be anywhere from a minute to a year? Well, the response is our expert has always been faithful to the court's claim construction and to our argument that causation matters. He was posed questions during his deposition about what if the processing required an hour, if the program needed an hour to do its thing. That hour, if it's working, if the delay is caused by processing, it still falls within the idea of substantial concurrence. The idea that an ordinary skilled artisan would not know what substantially concurrent means, in light of the specification, doesn't pass muster. You're way over time. I didn't realize that. I better move my water bottle out in front of the clock. All right, you'll get one minute for your bottle. Thank you, Your Honor. Just very briefly on the indefinite at this point, I think it's illustrative that I.B.'s position has continued to shift on what counts as a processing delay. So the expert, you are exactly right, Your Honor, the expert said that the two steps to be substantially concurrent must be done, quote, as fast as it can and as soon as it can. There must be, quote, no other things that aren't necessary. And the step intervening here was undisputably unnecessary by the expert's own admission. It could have been designed differently without that intervening step. And there are actually benefits to having that intervening step. And so it wasn't just the notion of, well, there can't be a conscious delay, in other words, standing and waiting. But the intervening step has to occur in order for the system to process, right? It doesn't have to occur. As designed, yes, but that just means it doesn't infringe. It doesn't have to occur for the two concurrent steps or allegedly substantially concurrent steps to occur. Those are independent of this setting up the remote right. So you have the substantially concurrent copy on the local server. And those two happen at the same time. As the expert said, Mr. Webster said, you could have done it without that intervening step, the two end steps. In other words, are the two end steps done as fast as they can be? And here they ultimately weren't. And that shift, constant shift in position, it not only undermines their non-infringement or their infringement argument, but shows that this is indefinite. Thank you, Your Honor. Thank you.